Opinions of the Colorado Supreme Court are available to the public and can be accessed through the Judicial Branch's homepage at http://www.courts.state.co.us.  Opinions are also posted on the Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE
June 1, 2020

**2020 CO 46**

**No. 18SC686, *Richardson v. People*—Waiver—Juror Qualification—Disqualification of a Judge.**

The supreme court considers whether a trial judge reversibly erred by permitting his wife ("Juror 25") to serve on a jury in a criminal case over which he presided.

Because the defendant did not object to Juror 25 sitting on the jury, the supreme court concludes that he waived his challenge to Juror 25.  The supreme court also concludes that in the absence of a contemporaneous objection, the trial judge did not have a duty to excuse Juror 25 on his own or to disqualify himself.  Accordingly, the supreme court affirms the judgment of the court of appeals.

# The Supreme Court of the State of Colorado

2 East 14th Avenue • Denver, Colorado 80203

## 2020 CO 46

### Supreme Court Case No. 18SC686
*Certiorari to the Colorado Court of Appeals*
Court of Appeals Case No. 15CA526

### Petitioner:

Gary Val Richardson,

v.

### Respondent:

The People of the State of Colorado.

### Judgment Affirmed
*en banc*
June 1, 2020

**Attorneys for Petitioner:**
MS&M Law Office
Nicole M. Mooney
　*Denver, Colorado*

**Attorneys for Respondent:**
Philip J. Weiser, Attorney General
Paul Koehler, First Assistant Attorney General
　*Denver, Colorado*

**JUSTICE HOOD** delivered the Opinion of the Court.
**JUSTICE GABRIEL** dissents.

¶1 The defendant, Gary Val Richardson, was found guilty of multiple crimes by a jury that included the trial judge's wife ("Juror 25"). Making matters more peculiar, the judge at times casually tossed a spotlight on his relationship to Juror 25. He joked about what was for dinner and forcing his wife to spend more time with him. He also told counsel that he thought his wife would be a "fine juror" and at another point asked them to "[b]e nice" to her. However well-intentioned, all the fanfare around Juror 25 created fairly predictable questions on appeal: Had the judge at least inadvertently conferred a special status on his wife to which defense counsel and the other jurors were expected to defer? Should the judge have excused his wife or himself, even without being asked to do so?

¶2 We conclude that by failing to object, Richardson waived his challenge to Juror 25. We also conclude that the trial judge did not have a duty to excuse Juror 25 from the jury or recuse himself in the absence of any contemporaneous objection. While the trial judge could have handled this unusual situation in a more restrained manner, his failure to do so did not create reversible error.

¶3 Accordingly, we affirm the judgment of the court of appeals.

## I. Facts and Procedural History

¶4 While hiding in a basement crawl space, Richardson allegedly fired one or two shots in the direction of a group of law enforcement officers. As a result, he was charged with ten counts of attempted extreme indifference murder (one per

2

officer), ten counts of attempted second degree assault (one per officer), one count of possession of a controlled substance, one count of violation of bail bond conditions, and one count of possession of a weapon by a previous offender.

¶5 Because of actions taken by the trial court, the case ultimately proceeded to trial on eight counts of attempted second degree assault, along with the possession of a controlled substance, bail, and weapon charges. At trial, Richardson did not have to defend against any attempted murder charges.

¶6 During the jury selection process, one of the prospective jurors disclosed on her juror questionnaire that her husband was the trial judge. This was Juror L.E., also known as Juror 25.

¶7 Aware that his wife was one of the prospective jurors, the trial judge told the prosecutor and defense counsel, before the prospective jurors entered the courtroom, to "[b]e nice to Juror 25. My dinner is on the line."

¶8 When it was the prosecutor's turn to question the prospective jurors, he engaged in the following colloquy with Juror 25:

> [PROSECUTOR]: Do any of you know each other? . . . One time I asked that question and some guy said that's my wife. There was a husband and a wife on a jury. I kind of bring that up because Ms. [E.], [the trial judge] is your husband?
>
> [JUROR 25]: Yes.
>
> THE COURT: Lucky you.

3

[PROSECTUOR]: I never had that one before. I had my boss's wife on a jury once for a little bit. Ms. [E.], good morning. Is there any reason that you don't think you could be fair if you ended up on this jury?

[JUROR 25]: No.

[PROSECUTOR]: Have you ever been on a jury before?

[JUROR 25]: Yes, I have.

[PROSECUTOR]: In Adams County?

[JUROR 25]: No. It was in Jefferson County.

[PROSECUTOR]: I know you mentioned on your questionnaire—it says [the trial judge's name] on the top. You'd be worried about a possible distraction. Just like anyone, the main purpose is to be able to pay attention to the evidence and to make your decision based on that without any distractions. If you are selected to be on this jury, are you worried you'd be distracted or would you be able to give your full attention to the case?

[JUROR 25]: I would give my full attention to the case.

[PROSECUTOR]: Okay. Thank you.

¶9 After the prosecutor finished questioning the prospective jurors, it was defense counsel's turn. But he did not ask Juror 25 any questions.

¶10 Defense counsel then challenged several jurors for cause. But he did not challenge Juror 25. Nor did either party exercise a peremptory challenge to excuse Juror 25. Before defense counsel exercised his fifth peremptory challenge, the trial judge stated, "[Juror 25]? We have the defendant's fifth peremptory challenge to

4

the panel. I need you to make a call." In response, defense counsel excused a different juror.

¶11 Following peremptory challenges, the jury was sworn and excused for a brief recess. Outside the presence of the jury, the trial judge addressed the issue of his wife sitting on the jury in the following exchange with defense counsel:

> THE COURT: Quite frankly, I don't know that I've ever heard of a sitting judge having a spouse or family member on the jury. There's nothing wrong with it. I think she'll be a fine juror. I have not spoken to her about this case.
>
> I will call my son who lives with us and I will tell him that. I will also tell him that he can't make any comments to his mother about being on this jury. I don't want them to have any discussion. Anything else?
>
> [DEFENSE COUNSEL]: I think we're both afraid to challenge her.
>
> THE COURT: That wasn't a stupid idea. Thank you. I appreciate it.
>
> [DEFENSE COUNSEL]: Thank you.

¶12 At no point did Richardson's counsel ask the trial judge to recuse himself.

¶13 The trial proceeded over four days. During this time, the trial judge made a comment to or regarding Juror 25 on four more occasions:

- Following the last witness's testimony on the first day of trial, Juror 25 stated that she had a question. The judge responded, "After both sides have had the opportunity to ask all questions, then you can ask that." After Juror 25 indicated she understood, the judge remarked, "I said no to my wife."

5

- Then, immediately before dismissing the jury on the first day, the trial judge asked Juror 25, "What are we having for dinner?" Juror 25 responded, "Chicken from last night," to which the judge replied, "Sounds good."

- On the third day of trial, defense counsel alluded to Juror 25 in his closing argument: "We didn't bring you here but this has taken you away from your work. It's taken you away from your families and your children. It's taken you away from your spouses. Not everyone has been taken away." This prompted Juror 25 to state, "I've spent more time with him this week than usual." The trial judge responded, "You forced her to spend more time with me which is worse." Before continuing with his closing argument, defense counsel commented, "That is unique in jurisprudence in Colorado."

- Immediately before dismissing the jury on the third day, the trial judge again asked Juror 25 about their dinner plans:

  THE COURT: What am I getting tonight? We'll get the teriyaki.

  [JUROR 25]: Chicken.

  THE COURT: I'm getting chicken again? Oh God. Get back here at 8:30 and be ready to roll. I'm sorry to have kept you so late. Questions? Thank you. Drive carefully on the way home. Wear your seatbelts.

¶14 The jury ultimately found Richardson guilty of two counts of attempted second degree assault, three counts of attempted third degree assault (as lesser included offenses), one count of violation of bail bond conditions, and one count

of possession of a controlled substance. The trial court granted Richardson's motion for judgment of acquittal on three counts of attempted second degree assault, and the jury acquitted Richardson of possession of a weapon by a previous offender.

¶15 Finding that Richardson had five prior felony convictions, the court sentenced him to sixteen years for each attempted second degree assault conviction, six months for each attempted third degree assault conviction, six years for the violation of bail bond conditions conviction, and one year for the possession of a controlled substance conviction. But the court exercised its discretion and ordered Richardson's sentences to run concurrently. In other words, Richardson received sixteen years total.

¶16 Richardson appealed, contending among other things that Juror 25's participation on the jury violated his constitutional right to a fair trial before an impartial jury and was therefore structural error mandating reversal.

¶17 In a split decision, a division of the court of appeals disagreed. *People v. Richardson*, 2018 COA 120, __ P.3d __. The majority reasoned that Richardson at least forfeited his challenge to Juror 25. *Id.* at ¶ 31. It then concluded that the trial judge's failure to excuse Juror 25 or himself from the trial did not require reversal under a plain error standard of review. *Id.* at ¶¶ 33, 47. The majority emphasized that the record reflected "no suggestion of juror bias, and no evidence of prejudice

7

to Richardson." *Id.* at ¶ 47. Still, the majority observed that it would have been prudent for the trial judge to excuse his wife or himself from the trial and that the trial judge's comments to and about his wife "affected the solemnity of the proceedings and were ill-advised." *Id.* at ¶¶ 45, 47.

¶18 Judge Furman dissented in part. In his view, Juror 25's participation created an appearance of impropriety and affected the structure of the trial. *Id.* at ¶ 84 (Furman, J., concurring in part and dissenting in part). Accordingly, he concluded that the judge committed reversible error by permitting his wife to serve on the jury. *Id.* at ¶ 124.

¶19 Richardson then petitioned this court for certiorari review.[1]

## II. Analysis

¶20 After identifying the standard of review, we consider whether Richardson waived his challenge to Juror 25. Concluding that he did, we then consider whether the trial judge had a duty to sua sponte excuse Juror 25 or recuse himself from the trial. On the facts before us, we conclude that the trial judge had no such duty.

---

[1] We granted certiorari to review the following issue:

> [REFRAMED] Whether the trial judge reversibly erred by permitting his wife to serve on a jury in a criminal case over which he presided.

## A. Standard of Review

¶21 We must first determine whether Richardson waived his challenge to Juror 25. Whether a claim is waived is a question of law we review de novo. *Stackhouse v. People*, 2015 CO 48, ¶ 4, 386 P.3d 440, 442.

¶22 Whether the trial judge had a duty to excuse Juror 25 or recuse himself from the trial is a question of law we review de novo. *See People v. Julien*, 47 P.3d 1194, 1197 (Colo. 2002).

## B. Whether Richardson Waived His Challenge to Juror 25

¶23 Richardson contends that under the unique circumstances of this case, his present challenge to Juror 25 is preserved for our review. The People, on the other hand, contend that he waived this claim. Recall that the division majority met the parties in the middle and concluded that Richardson at least forfeited any challenge to Juror 25. Therefore, it reviewed for plain error. Faced with this spectrum, we begin by discussing how we review unpreserved claims of error.

¶24 Constitutional and statutory rights can be waived or forfeited. *Phillips v. People*, 2019 CO 72, ¶¶ 16, 17, 443 P.3d 1016, 1022. Waiver is "the intentional relinquishment of a known right or privilege." *People v. Rediger*, 2018 CO 32, ¶ 39, 416 P.3d 893, 902 (emphases omitted) (quoting *Dep't of Health v. Donahue*, 690 P.2d 243, 247 (Colo. 1984)). In contrast, forfeiture is "the failure to make the timely assertion of a right." *Id.* at ¶ 40, 416 P.3d at 902 (quoting *United States v. Olano*,

9

507 U.S. 725, 733 (1993)). While we may review a forfeited error for plain error, waiver extinguishes error and therefore any appellate review. *Id.*

¶25 Crim. P. 24(b)(2) instructs that "[a]ll matters pertaining to the qualifications and competency of . . . prospective jurors shall be deemed waived by the parties if not raised prior to the swearing in of the jury to try the case." *See also* § 13-71-140, C.R.S. (2019) ("The court shall not declare a mistrial or set aside a verdict based upon allegations of any irregularity in selecting, summoning, and managing jurors . . . unless the moving party objects to such irregularity or defect as soon as possible after its discovery and demonstrates specific injury or prejudice."). In other words, defense counsel must "challenge an allegedly biased juror to preserve the issue for appellate review." *People v. Abu-Nantambu-El*, 2019 CO 106, ¶ 37, 454 P.3d 1044, 1052; *see also People v. Russo*, 713 P.2d 356, 361 (Colo. 1986) ("[I]t is incumbent upon the challenging party to clearly state of record the particular ground on which a challenge for cause is made."). Counsel may also waive a challenge for cause to a prospective juror by failing "to use reasonable diligence during jury selection to determine whether the grounds for such a challenge exist. The test for reasonable diligence is whether counsel took the opportunity to adequately question a prospective juror." *Ma v. People*, 121 P.3d 205, 209 (Colo. 2005) (citation omitted). Ultimately, the decision of "what jurors to accept or strike" is a strategic decision

reserved for defense counsel. *Arko v. People*, 183 P.3d 555, 558 (Colo. 2008) (quoting *People v. Curtis*, 681 P.2d 504, 511 (Colo. 1984)).

¶26   Richardson concedes that his counsel did not challenge Juror 25. While defense counsel understood that Juror 25 was the trial judge's wife, he did not ask Juror 25 any questions, challenge Juror 25 for cause, or attempt to remove Juror 25 by peremptory challenge. The trial judge even seemed to invite defense counsel to exercise a peremptory challenge as to Juror 25 when he stated, "[Juror 25]? We have the defendant's fifth peremptory challenge . . . . I need you to make a call." Defense counsel responded by excusing a different juror. Thus, Richardson, through counsel, intentionally relinquished his right to challenge Juror 25.[2]

¶27   Still, Richardson urges us to consider his counsel's failure to challenge Juror 25 as a forfeiture. He contends that the trial judge's comments about his wife had a chilling effect on the parties, pointing to defense counsel's statement that the prosecutor and he were "both afraid to challenge [Juror 25]." The record doesn't reveal whether this remark was genuine or playful. What we do know is that

---

[2] Defense counsel could have had sound strategic reasons for this decision. *See Rediger*, ¶ 42, 416 P.3d at 902–03. After all, the jury found Richardson guilty of three lesser included offenses and acquitted him of one of the charges.

friendly banter seemed to occur at other points during the trial.[3]  The record also reveals defense counsel zealously advocated for Richardson following jury selection, belying any suggestion that counsel was afraid to incur the judge's wrath.  Thus, assuming without deciding that alleged intimidation by a trial judge can justify a forfeiture analysis, we see no chilling effect here that prompts us to examine these facts through the lens of forfeiture.

¶28     Richardson also contends that Juror 25's presence on the jury amounted to structural error because it violated his fundamental rights to a fair trial and to a fair, impartial, and independent jury.  *See People v. Novotny*, 2014 CO 18, ¶ 21, 320 P.3d 1194, 1201 (defining structural error as the limited class of errors "affecting the framework within which the trial proceeds — errors that infect the entire trial process and necessarily render a trial fundamentally unfair").  He argues in part that Juror 25's marriage to the trial judge produced an implied bias.[4]

---

[3] After the trial judge informed defense counsel that counsel had run out of time for questioning the prospective jurors, counsel remarked during a bench conference, "You cut me off when it was getting interesting."  And in discussing jury instructions, defense counsel quipped, "The instruction I gave to you and not the provocation?  I'm just joking."  The trial judge replied, "You're a walking provocation."

[4] Richardson further contends that Juror 25 should have been dismissed for cause under section 16-10-103(1)(b), C.R.S. (2019), which provides that a court must sustain a challenge for cause to a prospective juror if there is a "[r]elationship

But "even fundamental rights can be waived, regardless of whether the deprivation thereof would otherwise constitute structural error." *Stackhouse*, ¶ 8, 386 P.3d at 443; *see also Weaver v. Massachusetts*, 137 S. Ct. 1899, 1910, 1911–12 (2017); *Peretz v. United States*, 501 U.S. 923, 936 (1991) ("The most basic rights of criminal defendants are similarly subject to waiver."); *Phillips*, ¶ 16, 443 P.3d at 1022 (noting that "even fundamental rights can be waived"). Thus, while "the erroneous seating of an impliedly biased juror is . . . structural error," defense counsel must nevertheless challenge an allegedly biased juror as a prerequisite to appellate review. *Abu-Nantambu-El*, ¶¶ 2, 37, 454 P.3d at 1045, 1052. Because we conclude that defense counsel waived any challenge to Juror 25, we do not review Richardson's present challenge, even for structural error.

¶29 Richardson primarily relies on three out-of-state cases for the proposition that Juror 25's sitting on the jury required automatic reversal: *Elmore v. State*, 144 S.W.3d 278 (Ark. 2004); *People v. Hartson*, 553 N.Y.S.2d 537 (N.Y. App. Div. 1990); and *State v. Tody*, 764 N.W.2d 737 (Wis. 2009), *abrogated by State v. Sellhausen*,

---

within the third degree, by blood, adoption, or marriage, to a defendant or to any attorney of record or attorney engaged in the trial of the case." But defense counsel did not challenge Juror 25 on this ground. *See Abu-Nantambu-El*, ¶ 37, 454 P.3d at 1052; *Russo*, 713 P.2d at 361. In any event, we are not persuaded that a trial judge is either an "attorney of record," or an "attorney engaged in the trial of the case." *See* Crim. P. 24(a)(2), (b)(1)(II) (separately identifying a "judge" and an "attorney").

809 N.W.2d 14 (Wis. 2012). But in *Elmore* and *Tody*, defense counsel challenged the trial judge's wife, 144 S.W.3d at 279, or mother, 764 N.W.2d at 741, for cause. And in *Hartson*, the defendant moved to set aside the verdict on the ground that he was denied a fair trial because the trial judge's wife sat on the jury. 553 N.Y.S.2d at 538. In all three cases, the trial judge denied the challenges. *Elmore*, 144 S.W.3d at 279; *Hartson*, 553 N.Y.2d at 538; *Tody*, 764 N.W.2d at 742. Thus, unlike this case, this issue was raised and ruled upon in the trial court.

¶30     We conclude that Richardson waived his challenge to Juror 25.

### C. Whether the Trial Judge Had a Duty to Sua Sponte Excuse Juror 25 or to Recuse Himself

¶31     Richardson further contends that the trial judge had a duty to act even without objection—either by excusing Juror 25 on his own or by stepping away from the trial and finding another judge. We address these contentions in turn.

¶32     Regarding Juror 25, "a trial judge is not required to excuse a prospective juror sua sponte." *Abu-Nantambu-El*, ¶ 37, 454 P.3d at 1052 (citing *People v. Coney*, 98 P.3d 930, 934 (Colo. App. 2004) (noting "we are aware of no authority that requires the trial court" to excuse a juror sua sponte)); *cf. People v. Metcalfe*, 782 N.E.2d 263, 272 (Ill. 2002) ("[A]lthough a trial court certainly has the discretion to remove a juror *sua sponte* for cause, a trial court does not have a duty to do so." (citation omitted)). Thus, the trial judge had no duty to excuse Juror 25 without the benefit of an objection.

14

¶33 Regarding the trial judge, Richardson's counsel did not ask the judge to recuse even though the law afforded him the opportunity to do so. C.R.C.P. 97 (outlining the procedure for a party seeking a change of judge); Crim. P. 57(b) (noting the Colorado Rules of Civil Procedure apply in the absence of a governing Rule of Criminal Procedure); *see also People in Interest of A.G.*, 262 P.3d 646, 652 (Colo. 2011) (noting that "[i]f grounds for disqualification [of a judge] are known and not promptly raised, it may constitute waiver").

¶34 While the failure to make such a request no doubt invites speculation about whether counsel was intimidated, speculation is a two-way street. At a preliminary hearing, the trial judge forced an election that prompted the prosecution to abandon the attempted murder charges in favor of the attempted second degree assault charges. The judge also dismissed two counts of attempted second degree assault. And, midtrial, he granted Richardson's motion for judgment of acquittal regarding three additional counts of attempted second degree assault. Was defense counsel cowed? Or was he simply making a strategic choice? The record leaves us only to surmise.

¶35 Sidestepping these concerns, Richardson instead argues that the judge should have recused himself sua sponte. In assessing the force of his argument, we turn first to the statute that tells us when a judge has such an obligation. Under this statute, a trial judge must, "on his own motion, disqualify himself" when he

"knows of circumstances which disqualify him in a case." § 16-6-201(2), C.R.S. (2019); *accord* Crim. P. 21(b)(2). A trial judge must disqualify himself if (1) "[h]e is related to the defendant or to any attorney of record or attorney otherwise engaged in the case"; (2) "[t]he offense charged is alleged to have been committed against the person or property of the judge or of some person related to him"; (3) "[h]e has been of counsel in the case"; or (4) "[h]e is in any way interested or prejudiced with respect to the case, the parties, or counsel." § 16-6-201(1); *accord* Crim. P. 21(b)(1).

¶36    Likewise, the Colorado Code of Judicial Conduct ("Code") requires a judge to "disqualify himself or herself in any proceeding in which the judge's impartiality might reasonably be questioned." C.J.C. 2.11(A). As relevant here, circumstances that might reasonably call into question a judge's impartiality include, but are not limited to, the following:

> (1) The judge has a personal bias or prejudice concerning a party or a party's lawyer, or personal knowledge of facts that are in dispute in the proceeding.
>
> (2) The judge knows that the judge, the judge's spouse or domestic partner, or a person within the third degree of relationship to either of them, or the spouse or domestic partner of such a person is:
> > (a) a party to the proceeding, or an officer, director, general partner, managing member, or trustee of a party;
> > (b) acting as a lawyer in the proceeding;
> > (c) a person who has more than a de minimis interest that could be substantially affected by the proceeding; or
> > (d) likely to be a material witness in the proceeding.

C.J.C. 2.11(A)(1)–(2).

16

¶37    Significantly, neither a statute nor the Code expressly requires a judge to sua sponte disqualify himself when he is related to a juror. Moreover, Richardson does not contend that the trial judge was biased or prejudiced toward a party or counsel, and nothing in the record reasonably calls into question the judge's impartiality toward the parties. *See Estep v. Hardeman*, 705 P.2d 523, 526 (Colo. 1985) ("[E]ither actual prejudice on the part of the trial judge or its mere appearance can require the disqualification of that judge."); *Smith v. Dist. Court*, 629 P.2d 1055, 1056 (Colo. 1981) ("Unless a reasonable person could infer that the judge would in all probability be prejudiced against [a party], the judge's duty is to sit on the case.").

¶38    Still, Richardson points to broader canons of judicial ethics that should have prompted recusal. For example, C.J.C. 1.2 states, "A judge shall act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety." And C.J.C. 2.4(B) states, "A judge shall not permit family, social, political, financial, or other interests or relationships to influence the judge's judicial conduct or judgment." He contends that the trial judge's failure to recuse himself created at least the appearance of impropriety and that the judge's comments to and about Juror 25 reflected Juror 25's influence on the judge's conduct.

¶39 But these ethical rules are "intended to protect public confidence in the judiciary rather than to protect the individual rights of litigants." *A.G.*, 262 P.3d at 650; *see also* C.J.C. Scope 7 (noting the Code is not "intended to be the basis for litigants to seek collateral remedies against each other"); *People v. Gallegos*, 251 P.3d 1056, 1063 (Colo. 2011) (recognizing that "rules of judicial ethics 'are designed not to protect individual defendants, but to protect the judiciary from charges of partiality'" (quoting *State v. Fremont*, 749 N.W.2d 234, 242 (Iowa 2008))). Thus, in the absence of evidence demonstrating actual judicial bias or prejudice, a trial judge's potential violation of these rules does not mandate reversal. *See A.G.*, 262 P.3d at 651 ("In contrast to judicial canons seeking to prevent the appearance of impropriety, laws requiring disqualification of a biased or prejudiced judge are designed to ensure that litigants receive a fair, impartial trial."); *see also id.* at 650 ("Because the concern is the reputation of the judiciary rather than protection of the parties, litigants may waive disqualification when the disqualification is not for reasons of actual bias or prejudice." (citing C.J.C. 2.11(C))); *cf. Hagos v. People*, 2012 CO 63, ¶ 10, 288 P.3d 116, 119 (noting "trial before a biased judge" is structural error).

¶40 Even if the Code might have prompted other judges, in exercising their discretion, to recuse, we discern no reversible error on the facts before us here.

## III. Conclusion

¶41    We affirm the judgment of the court of appeals.

**JUSTICE GABRIEL** dissents.

JUSTICE GABRIEL, dissenting.

¶42    The majority principally construes the issue before us as a question of juror qualification and concludes that defendant Gary Val Richardson waived any challenge to the trial judge's wife's serving as a juror in this case. Maj. op. ¶¶ 2, 23–30. In my view, the majority asks the wrong question and arrives at the wrong answer. Unlike my colleagues, I do not see the question before us as a juror qualification issue. Rather, to me, the question is whether Richardson was denied a fair trial when the trial judge sat on a case in which his wife served as a juror *and* in which the judge told everyone in the courtroom to "be nice" to his wife and then repeatedly reminded everyone of his relationship with her.

¶43    Because the judge's conduct, however well-intentioned it may have been, undermined the independence of the jury in this case and created an obvious appearance of impropriety, and because the errors committed here defy any showing of prejudice, I would conclude that the errors were structural, and I would reverse the judgment and remand this case for a new trial.

¶44    Accordingly, I respectfully dissent.

## I. Factual Background

¶45    The majority accurately lays out the material facts, and I will not repeat them at length here. Instead, I note only those facts that are pertinent to my analysis.

1

¶46   Although the People repeatedly refer to the comments of the trial judge and defense counsel as "minor jokes," this case was no "minor joke" to Richardson. He was tried as a habitual criminal with possession of a controlled substance, violation of bail bond conditions, five counts of attempted second degree assault or attempted third degree assault, and possession of a weapon by a previous offender. The jury ultimately convicted him of most of these charges, and the court sentenced him to an effective term of sixteen years in the Department of Corrections.

¶47   It is undisputed that Juror No. 25 in this case was the trial judge's wife. It is further undisputed that throughout the trial, the court repeatedly called attention to this fact.

¶48   For example, at the very beginning of voir dire, the judge stated, in open court, "Be nice to Juror 25. My dinner is on the line."

¶49   Then, during voir dire, the prosecutor asked Juror No. 25, "[The] Judge . . . is your husband?" Juror No. 25 confirmed in open court that he was, and the judge responded, "Lucky you."

¶50   After both parties had finished exercising their peremptory challenges and the jury was empaneled, the judge and counsel had the following exchange outside the jury's presence:

> THE COURT: Quite frankly, I don't know that I've ever heard of a sitting judge having a spouse or family member on the jury. There's

2

nothing wrong with it. I think she'll be a fine juror. I have not spoken to her about this case.

[DEFENSE COUNSEL]: I think we're both afraid to challenge her.

THE COURT: *That wasn't a stupid idea.* Thank you. I appreciate it.

(Emphasis added.)

¶51 The trial proceeded, and throughout the trial and in front of the jury, the judge made repeated comments toward and about his wife. For example, on several occasions, the judge asked Juror No. 25, on the record, what they were having for dinner. Similarly, the following dialogue took place on the record on the third day of trial:

THE COURT: What am I getting tonight? We'll get the teriyaki.

JUROR [No. 25]: Chicken.

THE COURT: I'm getting chicken again? Oh God.

¶52 And the following exchange took place at the beginning of defense counsel's closing argument:

[DEFENSE COUNSEL]: [This trial has] taken you away from your families and children. It's taken you away from your spouses. Not everyone has been taken away.

JUROR [No. 25]: I've spent more time with him this week than usual.

THE COURT: You forced her to spend more time with me which is worse.

[DEFENSE COUNSEL]: That is unique in jurisprudence in Colorado.

3

¶53 Although the People characterize these comments—and particularly defense counsel's statement that the lawyers were afraid to challenge the judge's wife—as minor jokes, it is not at all clear to me that they were. In particular, I deem significant that after counsel noted that he thought the lawyers were afraid to challenge the judge's wife, the judge responded, "That wasn't a stupid idea," and then he thanked counsel, apparently for the courtesy to him. Likewise, although the People support their assertion that the above-quoted comments were jokes by noting that defense counsel himself alluded in his closing argument to the fact that the judge's wife was sitting on the jury, to me, counsel's comment was just as likely an effort to make the most out of an uncomfortable situation or a tacit acknowledgment of the wife's special status as a juror.

## II. Analysis

¶54 I begin by addressing what I believe to be our applicable standard of review, and I conclude that once error is established, our review should be for structural error. I then address what I perceive to be the errors here, and I conclude that these errors require reversal.

## A. Standard of Review

¶55 The question of whether a jury's deliberations have been subject to improper influence is a question of law that we review de novo. *See People v. Wadle*, 97 P.3d 932, 938 (Colo. 2004) ("[T]he question whether there exists a reasonable possibility

that extraneous communications with a jury influenced its verdict is a matter of law, to be resolved independently by a reviewing court."). Likewise, whether a trial court's undisputed conduct improperly chilled an attorney's right to advocate on behalf of his or her client appears to be a question of law, and we therefore review such a contention de novo. *See People v. Vanness*, 2020 CO 18, ¶ 16, 458 P.3d 901, 904 ("We review questions of law de novo."); *People v. Valdez*, 969 P.2d 208, 211 (Colo. 1998) ("When the controlling facts are undisputed, the legal effect of those facts constitutes a question of law which is subject to de novo review."); *Camp Bird Colo., Inc. v. Bd. of Cty. Comm'rs*, 215 P.3d 1277, 1281 (Colo. App. 2009) (noting that appellate courts review de novo the application of law to undisputed facts).

¶56 Once we determine that an error has occurred, we must apply the proper standard for reversal, e.g., structural error, constitutional harmless error, harmless error, or plain error. *Hagos v. People*, 2012 CO 63, ¶ 9, 288 P.3d 116, 118–19.

¶57 As pertinent here, structural errors require reversal without an individualized analysis of how the errors impaired the reliability of the judgment of conviction. *Id.* at ¶ 10, 288 P.3d at 119. Examples of this kind of error include the complete deprivation of counsel, trial before a biased judge, the unlawful exclusion of members of a defendant's race from a grand jury, the denial of the right to self-representation, and the denial of the right to a public trial. *Id.*

¶58 "[T]he defining feature of a structural error is that it 'affect[s] the framework within which the trial proceeds,' rather than being 'simply an error in the trial process itself.'" *Weaver v. Massachusetts*, 137 S. Ct. 1899, 1907 (2017) (quoting *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991)). For this reason, structural errors defy harmless error analysis. *Id.* at 1907–08.

¶59 The reasons vary as to why a particular error is not amenable to harmless error analysis. *Id.* at 1908. An error is structural when the right at issue "is not designed to protect the defendant from erroneous conviction but instead protects some other interest," as, for example, a defendant's right to conduct his or her own defense. *Id.* An error is also structural when "the effects of the error are simply too hard to measure," as, for example, when a defendant is denied the right to select his or her own attorney. *Id.* In such a case, the precise effect of the violation cannot be ascertained, thereby making it virtually impossible for the People to prove that the error was harmless beyond a reasonable doubt. *Id.* As a result, courts have determined that "the efficiency costs of letting the government try to make the showing are unjustified." *Id.* Finally, an error is structural when "the error always results in fundamental unfairness," as, for example, when an indigent defendant is denied an attorney or the trial court fails to give a reasonable-doubt instruction. *Id.* In my view, the errors alleged here fall into the second category, that is, errors that are too difficult to measure.

6

## B. The Trial Court's Errors Here

¶60 "[C]ourts clearly have the responsibility to ensure that a criminal defendant receives a fair trial." *People v. Frisco*, 119 P.3d 1093, 1096 (Colo. 2005). This includes ensuring that a defendant is provided a fair and impartial jury that is independent and that can serve as an appropriate check on the trial judge's power. *See Peña-Rodriguez v. Colorado*, 137 S. Ct. 855, 860 (2017) ("Whatever its imperfections in a particular case, the jury is a necessary check on governmental power."); *Nailor v. People*, 612 P.2d 79, 80 (Colo. 1980) ("It is fundamental to the right to a fair trial that a defendant be provided with an impartial jury."); *State v. Tody*, 764 N.W.2d 737, 746 (Wis. 2009) (noting "the jury's function as, in part, a check upon the power of the judge"), *abrogated in part by State v. Sellhausen*, 809 N.W.2d 14, 28–29 (Wis. 2012) (Ziegler, J., concurring).

¶61 The court's responsibility to provide a fair trial also includes ensuring that all parties have a meaningful opportunity to be heard. *Whiteside v. Smith*, 67 P.3d 1240, 1248 (Colo. 2003) ("The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'") (quoting *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)). And trial judges must "promote[] public confidence in the independence, integrity, and impartiality of the judiciary" and "avoid impropriety and the appearance of impropriety." C.J.C. 1.2. In my view, the trial court erred in each of these regards.

¶62 From the outset of this trial, the trial judge made clear, albeit assuredly unintentionally, that his wife had special status as a juror. Thus, at the beginning of voir dire, the judge told everyone in the courtroom to "[b]e nice to Juror 25." The court then reinforced his wife's special status by repeatedly calling everyone's attention to her and reminding everyone that she was, in fact, his wife.

¶63 To me, this conduct likely ensured that the other jurors (and the parties and counsel) would give deference to the judge's wife throughout the trial, thereby impairing the independence of the jury and creating an obvious appearance of impropriety. Moreover, the court's conduct necessarily chilled the lawyers' advocacy. Indeed, as noted above, defense counsel made plain to the court, "I think we're both afraid to challenge her," and, unlike the People, I am unwilling to assume that this was just a "minor joke."

¶64 Confronting the same or similar issues, a number of courts have discerned error when a trial court has presided over a trial in which his or her spouse or a close relative sat as a juror. For example, in *Elmore v. State*, 144 S.W.3d 278, 279–80 (Ark. 2004), the Arkansas Supreme Court reversed and remanded for a new trial a defendant's rape conviction on the ground that the trial court had erred in denying the defendant's motion to strike for cause the trial judge's wife, who ultimately served on the jury. The court reasoned that the trial court's actions "created an appearance of questionable propriety." *Id.* at 280. In addition, the

court observed, "At the very least, the other jurors would likely give more credence or weight to the judge's wife's views than the others on the panel." *Id.*

¶65 Similarly, in *People v. Hartson*, 553 N.Y.S.2d 537, 538–39 (N.Y. App. Div. 1990), the New York appellate court reversed a defendant's conviction for rape and sodomy, concluding that the seating of the trial judge's wife on the jury required reversal of the conviction, even though the defendant did not raise a timely challenge to her or show prejudice. In the court's view, the juror's service gave "the unmistakable appearance of impropriety." *Id.* at 538. Moreover, as pertinent here, the court rejected the state's assertion that the defendant had not established prejudice because in the circumstances before the court, such proof was "likely to be out of defendant's reach." *Id.* And the court observed that the state's argument overlooked the fact that it was the interest of the public at large, and not merely that of the defendant, that was to be served. *Id.* The court thus concluded:

> Although an ethical violation involving the appearance of impropriety does not necessarily warrant reversal and a new trial, in our view, the right to the "fact and appearance" of a fair jury is so fundamental that the service of the spouse of the Trial Judge as a trial juror requires reversal of defendant's conviction.

*Id.* at 538–39 (quoting *People v. Shinkle*, 415 N.E.2d 909, 911 (N.Y. 1980); other citations omitted).

9

¶66 Finally, in *Tody*, 764 N.W.2d at 740, the Wisconsin Supreme Court concluded that the defendant was denied his constitutional right to be tried by an impartial jury when the trial judge's mother served as a juror. There, defense counsel challenged the judge's mother for cause, but the judge denied that challenge. *Id.* at 741–42. Defense counsel did not, however, then use a peremptory challenge to remove the judge's mother from the jury. *Id.* at 742.

¶67 The court first concluded that the defendant's failure to exercise a peremptory challenge did not result in a waiver of his right to raise on appeal the question of whether the juror's inclusion violated his constitutional right to be tried by an impartial jury. *Id.* After then discussing this constitutional right, the court noted that although it generally defers to a trial court's determination as to whether to strike a juror, it would not follow that usual practice in the case before it. *Id.* at 742–43. The court viewed appellate deference as "almost ludicrous" when the court was going to rely on the trial court's determination that a member of his or her immediate family was objectively impartial. *Id.* at 743. In the court's view, the appearance of fairness and propriety would clearly be lost in this situation. *Id.* Thus, the court stated:

> [T]he mother's presence may have a potential impact on the trial proceedings or the jury's deliberations. Counsel may be reluctant to challenge the [trial] court's adverse rulings with ordinary zeal if one of the jurors whom counsel needs to persuade happens to be an immediate family member of the presiding judge. The other jurors

may tend to give the deference to the judge's mother that they are presumed to give to the judge.

*Id.* at 745.

¶68 I find the reasoning of these cases persuasive, and I would adopt that reasoning here. Accordingly, I would conclude that the trial court erred in sitting on a case in which his wife served as a juror and in which he told everyone in the courtroom to "be nice" to his wife and then repeatedly reminded everyone in the room of their relationship.

## C. Structural Error

¶69 The question thus becomes whether the foregoing errors require reversal. The majority concludes that they do not, perceiving the issue before us to be one principally involving juror qualification and waiver. Maj. op. ¶¶ 2, 23–30. For the reasons noted above, I do not view this case as presenting a juror qualification issue. Rather, to me, the case concerns Richardson's right to a fair trial free from the taint that resulted from the judge's conduct and the circumstances here.

¶70 Addressing that issue, I note, as a preliminary matter, that I perceive nothing in the record that would allow me to conclude that Richardson intentionally relinquished his right to a fair trial, including the right to a fair and impartial jury. *Cf. Tody*, 764 N.W.2d at 742 (concluding that the defendant's failure to exercise a peremptory challenge did not result in a waiver of his constitutional right to be tried by an impartial jury).

11

¶71    Moreover, the question presented here is precisely the kind of issue that defies any showing of prejudice by a defendant.  Under CRE 606(b),

> a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith.

¶72    Thus, in circumstances like those present here, Richardson could never show that the judge's conduct, in fact, caused the other jurors to defer to his wife.  Nor could Richardson establish that the judge's conduct improperly influenced the independence of the jury.

¶73    Because these facts defy any showing of prejudice, I would conclude that the errors here were structural.  *See Weaver*, 137 S. Ct. at 1907–08.  I therefore would reverse the judgment of conviction and remand this case for a new trial.

### III.  Conclusion

¶74    Sometimes, judges' duty to follow the law leads them to what are perhaps counterintuitive results.  I do not see this as such a case, and I would reach what I perceive to be the intuitive result here, namely, that it was reversible error for the trial judge to sit on a case in which his wife served as a juror and in which he repeatedly called everyone's attention to his relationship with her.

¶75    For the reasons set forth above, the trial judge's conduct ensured special status for his wife as a juror, likely undermined the independence of the jury,

chilled the lawyers' advocacy, created an obvious appearance of impropriety, and ultimately deprived Richardson of the fair trial that the United States and Colorado Constitutions guarantee him.

¶76 I would therefore reverse Richardson's judgment of conviction and remand this case for a new trial.

¶77 Accordingly, and with respect, I dissent.